UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LYNN VINCENT, individually and
on behalf of JORDAN JAMISON, deceased;

    Plaintiff,

 v.               Case No. 11-C-205

QUALITY ADDICTION MANAGEMENT, INC.,
and JOYCE MADISON;

    Defendants.

## DECISION AND ORDER

### NATURE OF THE CASE

    This lawsuit commenced by the Plaintiff, Lynn Vincent ("Vincent"), individually and on behalf of her deceased son, Jordan Jamison ("Jamison"), is sadly illustrative of the devastating ripple effects of drug abuse and addiction. According to the Complaint, Jamison's May 24, 2008, death in Green Bay, Wisconsin was caused by his ingestion of 200 milligrams of liquid methadone, a Schedule II controlled substance, that he obtained from Defendant Joyce Madison ("Madison"). Madison obtained the methadone from Defendant Quality Addiction Management, Inc. ("QAM"), a corporation specializing in the treatment of persons suffering from opiate dependence.

Five causes of action are set forth in the Complaint: negligence against QAM (Count I); negligence against Madison - duty to third parties for violation of federal regulations (Count II); negligence per se - violation of a criminal statute (Count III); wrongful death (Count IV); and, intentional infliction of emotional distress (Count V). Jurisdiction over this action is alleged to arise under 28 U.S.C. § 1332, which requires that the parties be citizens of diverse states and that the amount in controversy exceed $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1331, federal question jurisdiction. The Complaint alleges that the matter arises under federal law because it involves a violation of a federal regulation, 42 C.F.R. § 8.12. (Compl. ¶ 2.) As will be further explained, QAM challenges these jurisdictional allegations.

## MOTION TO DISMISS

This Decision and Order addresses QAM's motion to dismiss pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure, for failure to state a cause of action and lack of subject matter jurisdiction. In QAM's moving brief, its primary contention is that the Complaint fails to state a cause of action against it. In its reply brief, QAM's subject matter jurisdiction arguments shift and expand.

### Subject Matter Jurisdiction

Because federal courts are courts of limited jurisdiction, the threshold question that the Court must resolve is QAM's challenge to the existence of federal jurisdiction. *See e.g. Buchel-Ruegsegger v. Buchel*, 576 F.3d 451, 453 (7th Cir. 2009). Subject matter

2

jurisdiction is not an issue that can be brushed aside, *see DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 740 (7th Cir. 2009) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); *United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir. 2000)).

When reviewing a dismissal for lack of subject matter jurisdiction, a district court must "'accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff.'" *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)). In determining whether to dismiss for lack of jurisdiction, "'[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Id.* (quoting *Long*, 182 F.3d at 554). The party invoking the federal court jurisdiction must establish jurisdiction. *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447 (7th Cir. 2005).

### Relevant Factual Background[1]

Prior to May 2008, Madison had a 14-year history as a family friend of Vincent and Jamison. Vincent, lives in Gwinn, Michigan, and Jamison lived in Gwinn with his mother. Madison, who lives in Oconto Falls, Wisconsin, was attempting to recover from an addiction to prescription narcotics and was being treatment at QAM's Green Bay branch. Her treatment included being prescribed methadone.

---

[1] The relevant facts are taken from the Complaint. For purposes of QAM's motion to dismiss, all well-pleaded facts are taken as true.

Methadone is a Schedule II substance because it is a highly addictive and dangerous narcotic with high potential for severe psychological or physical dependence. As a result, methadone's use in medical treatment is accompanied by severe restrictions. Section 8.12 of Title 42 of the Congressional Federal Regulations recognizes that as an addictive narcotic, methadone has a high potential to be illegally diverted from patients receiving methadone treatment to those who do not receive methadone treatment. As a drug addiction treatment center that prescribes methadone, QAM must abide by the standards set out in § 8.12, which includes close monitoring and assessments of treatment patients who receive take-home doses. During the spring of 2008, as a part of phase three of QAM's treatment program, QAM agreed to distribute, and Madison agreed to receive, take-home doses of methadone prescription every Wednesday.

On or about May 12, 2008, Jamison, living in Michigan at the time, visited Green Bay with his girlfriend. Although Jamison was in Green Bay at times relevant to the Complaint, and the address on his Wisconsin Identification Card was 1338 Weise Street, Green Bay, he did not intend to remain in Wisconsin.

On the morning of May 22, 2008, Jamison called Vincent and told her that he wished to return to Michigan in order to look for a job and "get back on his feet." Vincent called Madison. At Vincent's request, Madison purchased a bus ticket for Jamison that day so he could return to Michigan. Jamison did not use the bus ticket, but instead returned to Iron Mountain with a friend on May 22, 2008.

4

On May 23, 2008, Jamison briefly returned to Green Bay, to retrieve some of his belongings. During a telephone conversation, he told Vincent that he would take the bus that evening and return to Michigan.

However, that afternoon, Jamison and his girlfriend visited Madison's home. In the course of that visit, Madison intentionally violated QAM's instructions and policies by giving Jamison an unknown sum of money and at least 200 milligrams of liquid methadone that she had received as take-home doses from QAM. In exchange for methadone and money, Jamison provided Madison with a large bag containing about 80 Benadryl pills. Madison believed that the pills she had received from Jamison were Ecstasy,[2] OxyContin, and morphine. She intended to procure these addictive narcotics from Jamison in exchange for the take-home doses of methadone prescribed to her by QAM. Use of illegal and addictive narcotics such as Ecstasy, OxyContin, and morphine is a violation of QAM policy and Wisconsin criminal law.

During the evening of May 23, 2008, Jamison and his girlfriend rented a room at a Motel 6 in Green Bay. That evening, while in the Motel 6 room, Jamison ingested the methadone dose that Madison had received from QAM. Jamison died in his motel room between 8:00 a.m. and 9:00 a.m. on May 24, 2008. At approximately 1:30 p.m., Jamison was found dead in his motel room by a motel housekeeper. On May 25 and May 30, 2008,

---

[2]Ecstasy is the common term uses to refer to methylene-dioxymethamphetamine (MDMA).

5

Madison admitted to Vincent that she had given methadone to Jamison the night before his death.

On October 9, 2008, Madison was arrested and initially charged with first degree reckless homicide. Madison's charge was changed to manufacturing/delivering schedule I or II narcotics, a class E felony in Wisconsin according to Wisconsin Statute § 961.41(1)(a). Madison pled no contest to the charge of manufacturing/delivering schedule I or II narcotics and was found guilty of the charge on March 23, 2009.

Because QAM failed to properly assess, among other factors, Madison's long-standing addiction to prescription narcotics as a potential risk for illegal diversion, QAM failed to prevent the illegal diversion of methadone from Madison to Jamison by allowing her to take home one-week's worth of methadone at a time. Because QAM failed to properly monitor Madison's methadone use, QAM failed to prevent Jamison from receiving Madison's prescription of methadone. QAM's failure to properly monitor and assess Madison's use of all dangerous and addictive narcotics such as Ecstasy, OxyContin, and morphine, as well as her intake of the prescribed methadone, is a violation of the opioid treatment standards set forth in 42 C.F.R. § 8.12.

*Federal Question Jurisdiction*

QAM asserts that this action does not involve a federal question as required for jurisdiction under 28 U.S.C. § 1331. In its moving brief, QAM argues that 42 C.F.R. § 8 does not create a private cause of action for Vincent to pursue claims against QAM, or a standard

6

of care that QAM had to meet with regard to its care and treatment of its patients. (Def.'s Mem. Mot. Dismiss 4-6, 8.) Vincent responds that the regulation does not explicitly create a cause of action[3] but it forms an "essential component" of her state negligence claim, citing *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257 (1916). (Pl.'s Br. Resp. Mot. Dismiss 12 (unnumbered).) In its reply brief, for the first time, QAM focuses on the allegations of the Complaint that the matter arises under federal law because it involves a violation of a federal regulation, 42 C.F.R. § 8.12, rather than its earlier contention that the regulation does not create a private cause of action.

In *American Well Works*, cited by Vincent without discussion, the Supreme Court reversed the federal court's dismissal of an action for lack of subject matter jurisdiction. Having been filed in state court and removed to the federal court, the action was dismissed on a motion to remand, based on the determination that the cause of action arose under the federal patent laws, the state court had no jurisdiction, and, therefore, the federal court had no jurisdiction. The opinion, authored by Supreme Court Justice Oliver Wendell Holmes, focused on the complaint's allegations that the plaintiff was the owner, manufacturer, and seller of a pump, known as the best in the market, that was patented or the subject of a patent application, and that the defendants had falsely and maliciously libeled and slandered the plaintiff's title to the pump. *Id.* at 258. The Supreme Court held that

---

[3]Vincent's position that the regulation does not give rise to a private cause of action is consistent with the determination in *Cushing v. Moore*, 783 F.Supp. 727, 735-38 (N.D.N.Y.), *aff'd in part and remanded in part*, 970 F.2d 1103 (2d Cir. 1992), the sole federal court decision that this Court's research has disclosed that addresses the issue. In any event since Vincent does not assert that the regulation creates a federal cause of action, the Court need not address QAM's argument in that regard.

7

> a suit for damages to business caused by a threat to sue under the patent law is not itself a suit under the patent law. And the same is true when the damage is caused by a statement of fact, - that the defendant has a patent which is infringed. What makes the defendants' act a wrong is its manifest tendency to injure the plaintiff's business; . . . But whether it is a wrong or not depends upon the law of the state where the act is done, not upon the patent law, and therefore the suit arises under the law of the state. A suit arises under the law that creates the cause of action.

*Id*. at 258-59.

Vincent alleges common law claims and a state statutory wrongful death claim but refers to federal opiod treatment regulations. If analyzed under *American Well Works*, Vincent's causes of action arise under state law, which would not establish a basis for federal question jurisdiction. However, the Supreme Court has ruled that satisfaction of the *American Wells Works* inquiry, is "a sufficient rather than a necessary condition of the arising under jurisdiction." *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007).

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 310-15 (2005), holds that a state law action may arise under federal law if it implicates a significant federal issue. To determine whether a federal issue embedded in a state law claim gives rise to federal question jurisdiction, a court must inquire whether the claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. As such, federal question jurisdiction over a state action will exist where (1) there is a substantial and disputed federal issue, and (2)

8

the exercise of federal jurisdiction will not upset the balance of labor between state and federal courts. *Id*.

In *Grable*, the Internal Revenue Service ("IRS") seized the petitioner's property and gave notice of its sale to the petitioner only by certified mail. The petitioner brought a quiet title action in state court, arguing that the respondent's title was invalid because federal law requires the IRS to give notice by personal service. *Id.* at 310-11. The Supreme Court concluded that the case warranted federal jurisdiction in part because the federal statute was not only "actually in dispute" but was also "the only legal or factual issue contested in the case." *Id.* at 315. The Supreme Court also noted the government's interest in vindicating its own administrative action: "The Government has a strong interest in 'prompt and certain collection of delinquent taxes,' and the ability of the IRS to satisfy its claims from the property of delinquents requires clear terms of notice to allow buyers . . . to satisfy themselves that the [IRS] has . . . good title." *Id.* (citations omitted). The Supreme Court also emphasized the rarity of state title actions raising federal tax title provisions and the ultimately "microscopic effect" the exercise of federal jurisdiction would have on the "federal-state division of labor." *Id*.

In *Grable*, the petitioner relying on the Supreme Court's earlier decision in *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804 (1986), noted that federal law also does not provide a right of action for quiet title. 545 U.S. at 317. *Grable*, 545 U.S. at 316-19, distinguished *Merrell Dow*, which affirmed the determination that removal of a state

9

court based on federal question jurisdiction was improper. The state court tort action had alleged that the drug manufacturer's violation of the federal Food, Drug and Cosmetic Act ("FCA") constituted negligence as an element of the plaintiffs' allegations that the drug had caused birth defects. In removing the action to federal court, the manufacturer relied, in part, on those allegations. In upholding the determination that the action did not arise under federal law, the Supreme Court noted that Congress declined to create a private right of action for the alleged FCA violation; under those circumstances, the plaintiffs' allegation of an FCA violation as an element of their state tort claim was insufficient to support federal jurisdiction. 478 U.S. at 812.

In rejecting the petitioner's contention, the Supreme Court noted that the absence of a private cause of action in *Merrell Dow* was important but not determinative of whether a state-law claim could ever trigger federal jurisdiction. *Grable*, 545 U.S. at 318. Instead, the absence of a federal private cause of action was relevant to the extent that granting federal jurisdiction would have resulted in "a potentially enormous shift of traditionally state cases into federal court," an outcome Congress could have sanctioned (but did not) by creating a private right to sue. *Id*. at 319. In contrast, the Court held that allowing federal-question jurisdiction with respect to Grable's claims would have comparatively little impact on the federal case load because state title cases rarely raise actually disputed matters of federal law. *Id*. at 315.

The Supreme Court has cautioned that *Grable* permits federal jurisdiction only in a "slim category" of cases and that "it takes more than a federal element 'to open the "arising under" door.'" *Empire Healthcare Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699, 701 (2006) (quoting *Grable*, 545 U.S. at 513). *Empire*, 547 U.S. at 682, for example, held that there was no federal jurisdiction over an insurance carrier's claim for reimbursement where a federal statute established a comprehensive health insurance program for federal employees and authorized the Office of Personnel Management to contract with private carriers to offer healthcare plans to federal employees.

*Bennett*, 484 F.3d at 907, explains *Grable's* holding that the plaintiff's state law claim arose under federal law "because, apart from the procedural device (a quiet-title action), there was nothing in it but federal law, with the potential to affect the national government's revenues," and because the federal issue concerned "a federal agency's performance of duties under federal law." *Bennett* adds that "the influence of federal law on the outcome of a contract (or tort) suit is not enough to support the arising-under jurisdiction." *Id*. In *Bennett*, the appellate court determined that a state court tort action, brought by aircraft passengers and bystanders against an airline company, an aircraft manufacturer, and a city alleging causes of action including negligence, conscious disregard for safety, and product liability, did not arise under federal law despite the national regulation of many aspects of air travel. *Id*. at 912.

Applying the foregoing principles to this action, the Court notes that Vincent asserts that § 8.12 "explicitly enumerates QAM's duties as an opioid treatment program under

11

federal law." (Pl.'s Br. Resp. Mot. Dismiss 12 (unnumbered).) Indeed, § 8.12 is part of a federal regulatory scheme that establishes the procedures by which the Secretary of Health and Human Services determines whether a practitioner is qualified to dispense opioid drugs in the treatment of opioid addiction, and establishes the standards for the appropriate quantities of opioid drugs that may be provided for unsupervised use by individuals undergoing such treatment. *See* 42 C.F.R. § 8.1.

The Complaint alleges that QAM and Madison violated the federal opioid treatment regulations and relies on those regulations to postulate the existence of duties on the part of QAM and Madison and the breach of those duties. However, Vincent has not identified any provision of the regulation that is "actually disputed." *Grable*, 545 U.S. at 314. Without a clearly identified federal opioid standard subject to a live dispute in this case, jurisdiction under *Grable* is inappropriate. *See Arnold v. Baxter Healthcare Corp.*, 609 F.Supp.2d 712, 717 (N.D. Ohio 2009).

Even if Vincent had identified an "actually disputed" question regarding the opioid treatment regulation, there is no indication that determining whether QAM or Madison violated that regulation would turn on "a nearly pure issue of law;" instead, the Complaint suggests that it will present a "fact-bound and situation-specific" application of those standards to the particular facts of QAM's treatment protocol with Madison. *See Empire Healthcare*, 547 U.S. at 700-01 (internal quotation marks omitted). Federal jurisdiction under *Grable* is also inappropriate for that reason. *See id.* at 701; *Bennett*, 484 F.3d at 910 (rejecting

jurisdiction under *Grable* because the action turned on "a fact specific application of rules that come from both federal and state law rather than a context-free inquiry into the meaning of a federal law"); *See Navistar Int'l. Corp. v. Deloitte & Touche LLP*, No. 11 C 3507, 2011 WL 5131178, at *4 (N.D. Ill. Oct. 28, 2011) (collecting cases including *Rathore v. Bank of Am.,N.A.*, No. 11CV136-HEH, 2011 WL 2077538, at *5 (E.D. Va. May 24, 2011) and *Wash. Consulting Grp. v. Raytheon Tech. Servs. Co.*, 760 F.Supp. 2d 94, 106 (D.D.C. 2011)).

Additionally, the Court must consider whether accepting jurisdiction merely because the action involves federal opioid treatment standards would significantly upset the "congressionally approved balance of federal and state judicial responsibilities." *See Grable*, 545 U.S. at 314. The fact that there is no private right of action to enforce opioid standards, *see Cushing*, 783 F.Supp. at 735-38, while not dispositive of the absence of jurisdiction, weighs against it. *See Grable*, 545 U.S. at 318. Finding federal question jurisdiction over this action, "would move a whole category of suits to federal court" – tort claims arising from the violation of federal regulatory opiod treatment provisions by opiod treatment providers and their clients that otherwise could not be brought in federal court – that may be relatively common – unlike the particular type of quiet title suit brought in *Grable*. *See Bennett*, 484 F.3d at 911; *see also, Baker v. Johnson & Johnson*, 709 F.Supp. 2d 677, 683-84 (S.D. Ill. 2010). Based on the foregoing, this Court concludes, as a matter of law, that the involvement of 42 C.F.R. § 8.12 in Vincent's claims is not sufficient to establish that this matter arises

under federal law. Consequently, this Court lacks federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

*Diversity Jurisdiction*

QAM also maintains that the Complaint does not establish diversity jurisdiction because there is no diversity of citizenship between the parties. (Def.'s Mem. Mot. Dismiss 7-8.) In addition, QAM argues that the action must be dismissed for lack of diversity jurisdiction, relying upon Chapter 655 of the Wisconsin Statutes which governs actions against health care providers. (*Id*. at 8.) Vincent's response simply repeats the jurisdictional allegations of the Complaint and states that there is complete diversity.

QAM cites the venue provision of Chapter 655 which states: "[v]enue in a court action under this chapter is in the county where the claimant resides if the claimant is a resident of this state, or in a county specified in s. 801.50(2)(a) or (c) if the claimant is not a resident of this state." Wis. Stat. § 655.009. Section 801.50(2)(a) and (c) of the Wisconsin Statutes provide:

> Except as otherwise provided by statute, venue in civil actions or special proceedings shall be as follows:
>
> (a) In the county where the claim arose;
>
> * * *
>
> (c) In the county where a defendant resides or does substantial business[.]

14

Applying the foregoing state statutes, QAM maintains that, because all of its clinics are in Wisconsin, any claim against QAM would be venued in Wisconsin and, therefore, there is no diversity jurisdiction. (Def.'s Mem. Mot. Dismiss 8.)

At best, QAM's argument conflates the determination of citizenship for diversity purposes, *see Hertz Corp. v. Friend*, __ U.S. __, 130 S.Ct. 1181 (2010), with Wisconsin's statutory venue provisions – that is where Wisconsin law provides the action should be tried. *See State ex rel. Boyd v. Aarons*, 2 N.W.2d 221, 222 (Wis. 1942). QAM's contention in its moving brief that the Court does not have diversity jurisdiction over this action is premised upon a convoluted and flawed legal argument. QAM's venue argument does not provide a basis for dismissal of this action for lack of subject matter jurisdiction. *See Warner/Elektra/Atl. Corp. v. Village of Bensenville, Ill.*, No. 83 C 8230, 1986 WL 7509, at *1 (N.D. Ill. June 24, 1986).

In its reply brief, QAM explicitly argues for the first time that the Complaint's allegations regarding Jamison's citizenship are ambiguous and insufficient to establish diversity of citizenship. (Def.'s Reply Br. Mot. Dismiss 5-6, 8-9 (citing Compl. ¶¶ 20-21).) It maintains that the allegations are insufficient because they allege that Jamison "lived in" Michigan with Vincent; however, there is no allegation of domicile or intention to stay.

As to the latter contention, the Complaint alleges that although Jamison was in Wisconsin at times, he did not intend to remain here and instead intended to return to Michigan and get a job. An intention to stay in Michigan is implicit in the allegations.

15

However, the allegation regarding where Jamison "lived" is insufficient. *Hunter v. Amin*, 583 F.3d 486, 491-92 (7th Cir. 2009). Of relevance for diversity jurisdiction, is alleging the state that Jamison was a citizen of, in other words, his domicile. *See The Northern League, Inc. v. Gidney*, 558 F.3d 614 (7th Cir. 2009). Domicile is "the place that a person considers to be his permanent home." *Kijowska v. Haines*, 463 F.3d 583, 586 (7th Cir. 2006). In determining an individual's domicile, *Dakuras v. Edwards*, 312 F.3d 256, 258 (7th Cir. 2002), courts look both to a party's physical presence in a state and the party's intent to remain there. *Gilbert v. David*, 235 U.S. 561, 570 (1915); *Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996). The Complaint is insufficient to establish Jamison's citizenship for purposes of § 1332. Furthermore, "the federal diversity statute treats 'the legal representative' of a decedent's estate as a citizen of the same state as the decedent." *Hunter*, 583 F.3d at 491-92 (quoting *Gustafson v. zumBrunnen*, 546 F.3d 398, 400-01 (7th Cir. 2008) (citing 28 U.S.C. § 1332(c))).

A somewhat related problem, not addressed by QAM, is presented by the fact that Jamison was deceased when Vincent commenced the action. *See* Fed. R. Civ. P. 17(a)(1). A reading of Rule 17(a)(1) of the Federal Rules of Civil Procedure suggests that the action should have been brought by the personal representative of Jamison's estate. *See* Fed. R. Civ. P. 17(a)(1). The proper party to sue on behalf of Jamison's estate would be determined by the law of his domicile. *See* Fed. R. Civ. P. 17(b)(1). If Vincent is bringing this action both individually and as the personal representative of Jamison's estate, the Complaint should so allege.

16

Furthermore, although not raised by QAM, the allegations that Vincent "lives" in Michigan and that Madison "lives" in Wisconsin, are insufficient to establish citizenship for purposes of establishing diversity jurisdiction. *See The Northern League, Inc.*, 558 F.3d at 614. Vincent must file an amended complaint that properly alleges the state that each individual person is a citizen of. *See id.*

If Vincent fails to file an amended Complaint by the stated deadline, this action will be dismissed for lack of subject matter jurisdiction. If Vincent files an amended Complaint and QAM believes that the allegations are insufficient to establish diversity jurisdiction, QAM may renew its motion to dismiss for lack of subject matter jurisdiction.

Based on the foregoing, QAM's motion to dismiss is granted to the extent that there is no federal question jurisdiction over this action. Moreover, because Vincent has not established that subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332, the remainder of QAM's motion to dismiss for failure to state a claim is denied without prejudice.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

QAM's motion to dismiss is **GRANTED** to the extent that this Court lacks federal question jurisdiction under § 1331, and **DENIED** in all other respects.

**On or before March 8, 2012**, Vincent **MUST FILE** an amended complaint consistent with this Decision and Order.

Failure to file an amended Complaint by the stated deadline will result in dismissal of this action for lack of subject matter jurisdiction.

Dated at Milwaukee, Wisconsin, this 7th day of February, 2012.

BY THE COURT:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**